UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CFBP, LLC,

        Plaintiff/Counter-
        Defendant,

v.                      Case No. 8:09-cv-2322-T-33AEP

U.S. BANK, NATIONAL ASSOCIATION,

        Defendant/Counter
        Plaintiff,
_____/

U.S. BANK, NATIONAL ASSOCIATION,

        Third-Party Plaintiff,

v.

DIRAN ALEXANIAN,

        Third-Party Defendant.
_____/

## ORDER

    This cause is before the Court pursuant to Defendant U.S.
Bank, National Association's Motion for Summary Judgment as to
Counts I, III, IV, V, VI, and VII Asserted by CFBP, LLC and as
to Counts III, IV, and V of the Bank's Counterclaim and Third-
Party Claim (Doc. # 54), which was filed on April 14, 2011.
CFBP filed a Response in Opposition to the Motion for Summary
Judgment (Doc. # 62) on May 6, 2011.  For the reasons that
follow, the Court denies the Motion for Summary Judgment.

## I.   Factual Background

    Plaintiff CFBP is a Florida limited liability company and

is the mortgagor/borrower under a Mortgage and Security Agreement (the "Agreement"). (Doc. # 7 at ¶ 2).   Diran Alexanian is the President and Managing Member of CFBP. (Alexanian Aff. Doc. # 63 at ¶ 1).

Defendant, the Bank, is the mortgagee/lender under the Agreement.  (Doc. # 7 at ¶ 3).[1] Alexanian signed a guaranty associated with the Agreement. (Doc. # 26-3).  The mortgaged property under the Agreement is a multi-building, multi-tenant

---

[1] A plethora of banking institutions are involved in this case.   The Court will refer to Defendant as "the Bank" to avoid confusion.  CFBP initially designated "Wells Fargo Bank, National Association" as the defendant in this case. (Doc. # 1, 3).   On December 22, 2009, CFBP filed its "consent to second amendment of complaint" indicating that Defendant consented to amending the complaint "to substitute U.S. Bank as the proper party defendant in the place of Wells Fargo, National Association." (Doc. # 5).  It is also notable that the Agreement between the parties states that it is between CFBP, Alexanian and Lehman Brothers Bank FSB.   In the operative complaint, CFBP alleges "U.S. Bank is a national banking association organized under the laws of the State of Ohio with its principal place of business in Minnesota.  U.S. Bank is the successor trustee to LaSalle Bank National Association, as trustee for the registered holders of LB-USA Commercial Mortgage Trust 2007-C2, Commercial Mortgage Pass-Through Certificates, Series 2007-C2, and the mortgagee under the Agreement." (Doc. # 7 at ¶ 3).  The operative complaint also alleges that "Wachovia Bank National Association . . . is a national banking association and the authorized agent of U.S. Bank for the purpose of acting as the 'Master Servicer' of the Agreement pursuant to a pooling and servicing agreement among the Trust . . ., U.S. Bank, Wachovia, and LNR Partners, Inc." (Id. at ¶ 4).  LNR Partners "is a Florida corporation and the authorized agent of U.S. Bank . . . ." (Id. at ¶ 5).

industrial warehouse in Polk County, Florida with approximately 970,855 rentable square feet. (Alexanian Aff. Doc. # 63 at ¶ 2, 9).

On February 11, 2008, a fire damaged approximately 126,000 rentable square feet of the property. (Id. at ¶ 11). Packing Corporation of America, a paper and box manufacturer, occupied space that was destroyed by the fire. (Id. at ¶ 3). In addition, the fire damaged space occupied by Saddle Creek food distributor, also a tenant at the warehouse. (Id.)

As required by the parties' Agreement, CFBP carried a comprehensive all risk insurance policy (through Travelers Insurance Company) that provided full replacement cost coverage for the fire damage and also carried business income insurance in an amount equal to one hundred percent of the projected gross income from the property for a period of twelve months. (Doc. # 7 at ¶ 12-13).

CFBP and Travelers settled CFBP's claim in the total amount of $9,381,415.28, through three payments: (1) the initial insurance proceeds of $1,000,000.00 paid on March 3, 2008; (2) loss of rents and additional expenses of $576,361.70; and (3) the second insurance proceeds of $7,805,053.58 paid on August 20, 2008. (Alexanian Aff. Doc. # 63 at ¶ 4, 10). The parties do not appear to have any

3

disagreement concerning the initial insurance proceeds or the $576,361.70 loss of rents payment. Rather, the parties' disagreement concerns the second insurance proceeds in the amount of $7,805,053.58.

### A.   <u>The Agreement Regarding Insurance Proceeds</u>

The Agreement contains several detailed sections related to insurance proceeds. These sections of the Agreement are too lengthy to replicate; however, the most relevant passages will be discussed herein.

Section 4.3(b) provides in pertinent part:

> (b) If the Net Proceeds are equal to or greater than $250,000 or the costs of completing the Restoration is equal to or greater than $250,000 **Lender shall make the Net Proceeds available for the Restoration** in accordance with the provisions of this Subsection 4.3(b). The term "Net Proceeds" for purposes of this Section 4.3 shall mean: (1) the net amount of all insurance proceeds received by the Lender . . . as a result of such damage or destruction . . .

(Doc. # 7-2 at 21) (emphasis added).

The Agreement also states that the "Net Proceeds" as defined therein "shall be made available to Borrower for the Restoration" so long as ten conditions "are met." (<u>Id.</u>) The ten conditions concern: (1) events of default; (2) extent of the damage to the property; (3) continuation of existing leases at the property; (4) commencement of the restoration in

4

a timely manner; (5) operating deficits; (6) cash flow; (7)
completion of restoration within one year of the casualty; (8)
permits and zoning; (9) expeditiousness of restoration; and
(10) loss of access to the property. (Id.)

Section 4.3(b)(ii) of the Agreement also specifies that
"The Net Proceeds shall be held by Lender and, until disbursed
in accordance with the provisions of this Subsection 4.3(b),
shall constitute additional security for the Obligations."
(Id. at 22).  Section 4.3(b)(iii) of Agreement indicates:

> All plans and specifications required in connection
> with the Restoration shall be subject to prior
> review and approval in all respects by Lender and
> by an independent consulting engineer selected by
> Lender (the "Casualty Consultant"), **which approval
> shall not be unreasonably withheld or delayed.**
> Lender shall have the use of the plans and
> specifications and all permits, licenses and
> approvals required or obtained in connection with
> the Restoration.  The identity of the contractors,
> subcontractors and materialmen engaged in the
> Restoration, as well as the contracts under which
> they have been engaged, shall be subject to prior
> review and acceptance by Lender and the Casualty
> Consultant, which approval shall not be
> unreasonably withheld or delayed.  All costs and
> expenses incurred by Lender in connection with
> making the net proceeds available for the
> Restoration including, without limitation,
> reasonable counsel fees and disbursements and the
> Casualty Consultant's fees, shall be paid by
> Borrower.

(Id. at 22)(emphasis added).  In addition, Sections 4.3(b)(iv)
and (v) of the Agreement contemplate payments from the Bank to

5

CFBP "from time to time" and not "more frequently than once every calendar month." (<u>Id.</u>)

   B.   **Second Insurance Proceeds and Restoration Plans**

   Travelers issued the second insurance proceeds of $7,805,053.58 to CFBP and the Bank in a single instrument. Even though the Bank's name was listed on the check, along with CFBP, CFBP did not turn the check over to the Bank for its signature. Rather, CFBP deposited the $7,805,053.58 check at its local bank, Commerce Bank. (Alexanian Aff. Doc. # 63 at ¶ 11). Alexanian explains: "Due to the incomplete endorsement on the check, Commerce Bank notified me in writing that it would hold the funds in CFBP's management company's account, but would not disburse the funds without [the Bank's] consent." (<u>Id.</u>) Alexanian did not want to turn the check over to the Bank as an uninsured deposit because he feared that the Bank was on the brink of bankruptcy and because he thought that the Bank may have been subject to a government take-over. (<u>Id.</u> at ¶ 14(a)).

   Alexanian prepared a plan for restoration of the damaged property and sent it to the Bank on August 20, 2008. (<u>Id.</u> at ¶ 12). The plan was drawn to suit the needs of Packing Corporation of America, an anchor tenant at the warehouse. (<u>Id.</u>) The Bank advised Alexanian that consideration of any

restoration plans would be considered by LNR, the Bank's "special server." (<u>Id.</u> at ¶ 13).  On August 27, 2008, LNR representative Whitney Wheeler contacted Alexanian by letter but such letter did not mention CFBP's initial plan for restoration. (<u>Id.</u> at ¶ 15).  On September 16, 2008, Wheeler requested additional information from CFBP, which Alexanian provided. (<u>Id.</u> at ¶ 17).

From September through December 2008, CFBP pushed for approval of its restoration plan, (knowing that the Agreement provided only one year for the restoration to be completed) and Wheeler delayed. (<u>Id.</u> at ¶ 18-22).  Wheeler explained to Alexanian that he had other "five alarm fires" to extinguish and was too busy to review CFBP's plans. (<u>Id.</u> at ¶ 18). During this time, CFBP never missed a mortgage payment. Unbeknownst to CFBP, the Bank had internally determined that it would not consider or approve any restoration plan unless or until the second insurance proceeds were turned over to the Bank.  An internal Bank employee communication from Bob Fitzhugh on September 30, 2008, reads:

> [CFBP] currently has a request with LNR about constructing a new building for the tenant in the building previously damaged by the fire ($8M) . . . Since the borrower has not forwarded the $8M to us, we have asked LNR to communicate with the borrower that we need the funds here ASAP and until they are received, no reserve request will be funded.

> Should the borrower not respond to LNR's request,
> Denny at AB will be requested to forward a demand
> letter to borrower.

(Doc. # 64-26 at 15).

During his deposition, CFBP questioned Wheeler as to why Wheeler did not immediately deny CFBP's request for restoration proceeds if it was the Bank's position that CFBP's failure to turn over the check to the Bank disqualified CFBP from access to the insurance proceeds: "why didn't you deny his request on February 14, 2009, instead of continuing to demand . . . other information, more plans that cost him money, more efforts on his part to satisfy your requests for information, if this w[as] a disqualifier?  Why did you continue to underwrite and ask for information?"  Whitney responded, "Because to the extent that I could justify doing it, I have done my job if every monthly payment comes in and the loan pays off at maturity.  That's when I have done my job."  (Wheeler Dep. Doc. # 64 at 236:20-237:8).

Alexanian explained during his deposition:

> [W]hen I presented something, a plan that I thought
> would bring value to the property and my ability to
> pay the mortgage, . . . I was told by Whitney
> Wheeler that he was dealing with five-alarm fires,
> that he couldn't pay attention to my deal, he
> couldn't get anybody to focus on it, he couldn't
> give me the approval because there were other
> problems that they were dealing with.

(Alexanian Dep. Doc. # 54-2 at 43:20-44:2).

Alexanian further testified: "When I submitted my plans for approval to Whitney, he never said you couldn't rebuild. Never came up.  That topic never came up.  He waited - - and after many, many phone calls, he waited six months to deny rebuilding, which is a real detriment to the property." (Id. at 44:6-11).[2]

On December 19, 2008, the Bank declared CFBP in default due to CFBP's failure to turn over the second insurance proceeds to the Bank.  (Wheeler Dep. Doc. # 64 at 97:25-98:11; Alexanian Aff. Doc. # 63 at ¶ 24). In January 2009, Wheeler indicated that CFBP's restoration plans would not be considered until the Bank received the second insurance proceeds. (Alexanian Aff. Doc. # 63 at ¶ 25).  On February 5, 2009, CFBP turned over the second insurance proceeds to the Bank. (Id.)  Immediately after CFBP relinquished the second insurance proceeds, Wheeler indicated that "LNR was actively

---

[2]   In December 2008, Packing Corporation of America indicated that it was leaving the property and would not return. (Alexanian Dep. Doc. # 54-2 at 122, 159).  On December 22, 2008, CFBP submitted to Wheeler a new plan for restoration of the property.  A new plan was required because the first set of plans (which were neither approved nor rejected by the Bank prior to Packing Corporation of America's decision to leave the warehouse) were drawn to suit Packing Corporation of America.

reviewing the revised restoration plans and that he was doing his 'write-up'. . . . He also renewed his assurances . . . that he was 'advocating' the revised restoration plans." (<u>Id.</u> at ¶ 26).

On March 17, 2009, Wheeler requested additional information from CFBP including, among other things, detailed construction budgets and Alexanian's personal financial statement. (<u>Id.</u> at ¶ 27). Alexanian provided his financial statement, indicating that it was not feasible to provide the other documents. (<u>Id.</u>) On July 15, 2009, Alexanian sent Wheeler an email communication asking for the status of the revised restoration plans. (<u>Id.</u>) Wheeler responded, "The subject loan is in default and approval for the reconstruction has not yet been obtained." (<u>Id.</u> at ¶ 30).

On August 5, 2009, Alexanian contacted Wheeler to state that the loan was not in default, as monthly mortgage payments had been made timely and "like clockwork" since the beginning of the lending relationship. (<u>Id.</u> at ¶ 29, 31). On August 18, 2009, Wheeler contacted Alexanian and indicated that LNR was considering rejecting any and all restoration plans and, instead, opting to apply the second insurance proceeds to the loan balance. (<u>Id.</u> at ¶ 32). Alexanian objected to the application of the second insurance proceeds to the loan

10

balance and requested an explanation for the Bank's actions, which he felt were in violation of the Agreement. (Id.)

The Bank indicated that CFBP failed to meet several of the ten conditions for using the second insurance proceeds. For example, the Bank indicated that it was not "reasonably satisfied that the Restoration [would] be completed on or before . . . 12 months after the occurrence of such fire." (Doc. # 7-2 at 21).

It is CFBP's position that the Bank's delay in approving or rejecting any restoration plans prevented CFBP from being able to meet the ten conditions precedent to receiving the second insurance proceeds for restoration of the property as delineated in the Agreement.  CFBP continued to make its monthly mortgage payments through January 2010.  CFBP contends that the "Bank is knowingly and in bad faith impairing the current and future value of the Property and impairing CFBP's ability to service the Loan." (Doc. # 7 at ¶ 28).

## II.  **Procedural History**

On November 13, 2009, CFBP filed suit against the Bank (Doc. # 1), and on December 28, 2009, CFBP filed its second amended complaint (the operative complaint) against the Bank containing the following counts: breach of contract for wrongful retention of Restoration Proceeds (count I), breach

of contract for improper collection and retention of Replacement Account (count II), breach of the covenant of good faith and fair dealing (count III), declaratory judgment (count IV), imposition of constructive trust (count V), action for temporary injunction (count VI), and action for an accounting (count VII). (Doc. # 7).

The Bank filed a motion to dismiss on January 22, 2010, (Doc. # 12) which this Court denied on May 26, 2010. (Doc. # 23). On June 23, 2010, the Bank filed its Answer, Affirmative Defenses, Counterclaim, and a Third-Party Claim against Diran Alexanian. (Doc. # 26). The Bank asserted the following as its Affirmative Defenses to the Second Amended Complaint:

> (1) CFBP's losses, if any, are purely speculative and recovery of damages for such speculative losses is barred.
> (2) CFBP fails to state a cause of action for breach of contract because CFBP materially breached the Agreement and therefore cannot seek to enforce any of its terms.
> (3) CFBP's claims are barred by CFBP's failure to mitigate its damages.
> (4) CFBP's claims are barred by the doctrine of avoidable consequences.
> (5) CFBP's claims are barred by the doctrine of unclean hands.
> (6) CFBP's claims are barred in whole or in part by the doctrine of waiver.
> (7) CFBP's claims are barred in whole or in part by the doctrine of estoppel.
> (8) CFBP's claims are barred by the doctrine of set-off.
> (9) CFBP's claims are barred by the doctrine of anticipatory breach.

12

> (10) CFBP failed to satisfy conditions precedent to any recovery, or conditions precedent to its recovery on the grounds alleged have otherwise not occurred.

(Doc. # 26 at 9).

As noted, the Bank filed a Counterclaim against CFBP and a Third-Party Complaint against Alexanian (as guarantor). (Doc. # 26 at 10-21).  In the Counterclaim, the Bank asserts the following counts against CFBP: foreclosure of mortgage (count I); foreclosure of security interest (count II); breach of promissory note (count III); and breach of contract (count IV).  The Bank sues Alexanian for breach of Guaranty (count V).

On July 27, 2010, CFBP and Alexanian filed their Answer and ten Affirmative Defenses to the Bank's Counterclaim against CFBP and Third-Party Complaint against Alexanian. (Doc. # 29).  CFBP and Alexanian's first affirmative defense is that the Bank "fails to state a case of action for foreclosure of mortgage, foreclosure of security interest, breach of promissory note, breach of contract, or breach of guaranty as Defendant committed the first material breach of the Note and Mortgage, which also made performance by CFBP impossible as a result." (Doc. # 29 at 8, ¶ 58).

In their eighth affirmative defense, CFBP and Alexanian

state, "Any failure of CFBP to remit the insurance proceeds to [the Bank] at an earlier time was subsequently cured by CFBP and accepted by [the Bank] or through its authorized agents Wachovia or LNR Properties, Inc., thereby waiving any right to bring an action against CFBP or Alexanian arising out of those events." (Id. at ¶ 65).

In their tenth affirmative defense, CFBP and Alexanian contend:

> Contrary to the allegations of the Counterclaim, [the Bank] has failed to satisfy all conditions precedent to bringing any action against CFBP or Alexanian because . . . [the Bank] committed the first material breaches of the Note and Mortgage, including, but not limited to, breaching Section 4.3 and Section 3.4 of the Note, breaching the Reserve Letter between the parties, and having breached the implied covenant of good faith and fair dealing.

(Id. at ¶ 67).

CFBP and Alexanian's remaining affirmative defenses sound in failure to mitigate damages, doctrine of avoidable consequences, unclean hands, waiver, estoppel, and the business judgment rule. (Id. at ¶ 59-64, 66).

On October 11, 2010, the Bank filed its motion to sequester rents. (Doc. # 30). After hearing from both sides, the Court granted the motion to sequester rents. (Doc. # 58).

The Bank now seeks summary judgment as to each count

14

asserted in the Second Amended Complaint (with the exception of count II for breach of contract for improper collection and retention of the "Replacement Account").  The Bank also seeks summary judgment as to counts III (breach of promissory note), IV (breach of contract), and V (breach of guaranty) of its Counterclaim against CFBP and Third-Party Claim against Alexanian.  This case is set for a non-jury trial during the Court's August 2011, trial term. (Doc. # 17, 53).

### III. Legal Standard

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The Court must draw all inferences from the evidence in

the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See id.  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  See id.

**IV.  <u>Analysis</u>**

In this diversity case, the Court applies the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.  <u>Tech. Coating Apps., Inc. v. United States Fid. & Guar. Co.</u>, 157 F.3d 843, 844 (11th Cir. 1998).  Furthermore, this Court must apply Florida law in the same manner that the Florida Supreme Court would apply it.  <u>Brown v. Nicholas</u>, 8 F.3d 770, 773 (11th Cir. 1993).

In this case, the Court is called upon to interpret the terms of a written contract.  Contract interpretation is a matter of law to be determined by the Court. <u>Technical Coating</u>

16

Apps., Inc. v. U.S. Fid. And Guar. Co., 157 F.3d 843 (11th Cir. 1998).  "When the language of a contract is clear and unambiguous, its interpretation or construction is a matter of law." Action Nissan, Inc. v. Hyundai Motor Am., 617 F. Supp. 2d 1177, 1187 (M.D. Fla. 2008).

Under Florida law, which governs this dispute, "courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship or improvident bargain." Beach Resort Hotel Corp. v. Wieder, 79 So. 2d 659, 663 (Fla. 1955).

### A.   CFBP's Claims Against the Bank

CFBP's operative complaint against the Bank contains seven counts. (Doc. # 7).  The Bank seeks summary judgment on six of CFBP's complaint counts.  The Court determines that five of the six claims subject to the Motion for Summary Judgment (particularly, breach of contract due to wrongful retention of restoration proceeds, breach of the covenant of good faith and fair dealing, declaratory judgment, constructive trust, and temporary injunction) are all, at their core, focused on CFBP's contention that the Bank wrongfully retained and denied CFBP access to the second insurance proceeds.

17

Specifically, in count I, CFBP asserts that the Bank breached the Agreement when the Bank failed to release the second insurance proceeds to CFBP.  In count III, CFBP alleges that "by refusing to release the Restoration Proceeds . . . Bank has breached the implied covenant of good faith and fair dealing inherent in the Agreement." (Doc. # 7 at ¶ 47).  In count IV, CFBP seeks a declaration, among other things, regarding release of the second insurance proceeds.  CFBP seeks the imposition of a constructive trust as to the second insurance proceeds in count V.  In count VI, CFBP seeks an injunction barring the Bank from distributing the second insurance proceeds to any third party.

The Bank lumps CFBP's seventh complaint count--for an accounting--with the aforementioned complaint counts.  Review of CFBP's accounting claim, however, reveals that it concerns the "Replacement Account."  The parties have not briefed this Court on the matter of the replacement account whatsoever. The Bank did not move for summary judgment on count II of CFBP's complaint, for breach of contract in relation to the replacement account.  Because it is not subject to the motion for summary judgment, this Court will hold a bench trial on count II, for breach of contract in connection with the replacement account.  In addition, the Court denies summary

judgment as to CFBP's complaint count VII, for an accounting in connection with the replacement account. The Court will hold a bench trial on CFBP's action for an accounting because the Bank has not come forward with any evidence to demonstrate that it is entitled to summary judgment concerning the replacement account. The Court will now turn its attention to the complaint counts which have been briefed in the motion for summary judgment--those related to the second insurance proceeds.

### 1.   CFBP's Counts I, III, IV, V, and VI

The Bank argues that it is entitled to summary judgment on CFBP's claims concerning the second insurance proceeds. According to the Bank, the Agreement between the parties states that: (1) the Bank was supposed to hold the insurance proceeds for possible disbursement to CFBP; (2) CFBP had to satisfy the Bank's conditions precedent to disbursement of insurance proceeds; (3) the Bank had review and approval rights with respect to any plans that CFBP proposed; and (4) the Bank was entitled to exercise its discretion as to whether plans or proposals propounded by CFBP would be approved or rejected and whether it was satisfied that certain conditions precedent to distribution of insurance proceeds were met, or could be met, by CFBP.

19

### i.   **Possession of the Net Proceeds**

The Agreement refers to the insurance proceeds in dispute as the "Net Proceeds."  The Agreement appears to contemplate that the Bank would hold the Net Proceeds and disburse the Net Proceeds to CFBP, for the restoration of the property, upon satisfaction of certain conditions by CFBP.  The Agreement states, "If the Net Proceeds are equal to or greater than $250,000 or the costs of completing the Restoration is equal or greater than $250,000, **Lender shall make the Net Proceeds available for Restoration** in accordance with the provisions of this Subsection 4.3(b)." (Doc. # 7-2 at 21)(emphasis added).

The Agreement defines "Net Proceeds" as "the net amount of all insurance proceeds received by Lender" pursuant to Subsections 3.2(a)(i), (iv), and (vi). (<u>Id.</u>)  CFBP argues that the Bank was not entitled to possess the second insurance proceeds because the Agreement defines "Net Proceeds" as those "received" by Lender, and in this case, CFBP, rather than the Bank, "received" the proceeds.

The Agreement requires that "in the case of property damage [insurance, the policy] shall contain a 'mortgagee clause' in form acceptable to Lender providing, among other things . . . that the loss thereunder shall be payable to Lender." (Doc. # 7-2 at ¶ 3.2(d)).  Here, both the Bank and

20

CFBP were named on the second insurance proceeds check.  CFBP correctly points out that the Bank had the right, under the Agreement, to approve or reject CFBP's insurance policy choices and the Bank did not reject the policy at hand.  If the Bank wanted to be the sole payee on the casualty insurance policy, the Bank had the opportunity to make it so.  The Bank reviewed the insurance policy, made some changes, but never required that it be named the loss payee.  Alexanian explains:

> While the MSA's § 3.2(d) required the lender to be the loss payee for the property insurance policy, with the lender's review and approval, the Travelers' policy had never been issued that way. As shown in the 2007 certificate of insurance, [the Bank] was not the loss payee . . . . An identical 2008 certificate was transmitted to the Bank for review and approval. (CFBP Exhibit 169).  On April 6, 2008, [the Bank] requested in writing slight changes to the name of the mortgage holder, but did not object to [the Bank's] omission as loss payee (CFBP exhibit 170).  Based on this single request for revision, the final 2008 certificate of insurance was issued on April 16, 2008, naming CFBP's designee, Alexon Properties, Inc., as the sole loss payee (Lender Depo., Ex. 73).

(Alexanian Aff. Doc. # 63 at ¶ 14(b)).

Section 1.1 of the Agreement is also on point.  There, CFBP:

> **does hereby irrevocably mortgage**, **grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender**, and grant a security interest to Lender in, the following property, rights, interests, and estates now owned, or hereafter acquired by the Borrower ... (1) **all proceeds of and any unearned**

21

> **premiums on any insurance policies covering the
> Property**, including, without limitation, **the right
> to receive and apply the proceeds of any insurance**,
> judgments, or settlements made in lie thereof, **for
> damages to the Property**.

(Doc. # 7-2 at 7)(emphasis added).

The Agreement contemplated that the Bank would hold the
proceeds and disburse them to CFBP periodically, but without
unreasonable delay.   The Bank does not argue that CFBP
breached the agreement by failing to turn over the check, and
therefore, this Court will not make a finding regarding
whether CFBP should have turned the check over to the Bank.
Regardless of whether CFBP was wrongfully holding the check at
Commerce Bank, the Court determines that there is a genuine
issue of material fact in dispute regarding whether the Bank
breached the Section 4.3 of the Agreement with respect to
making the insurance proceeds available to CFBP during the
restoration process.

### ii.  Conditions Precedent

The Bank argues that it has demonstrated that CFBP was
not able to meet several of the Bank's conditions precedent to
distribution of the insurance proceeds.   For instance, the
Bank argues that it was entitled to withhold the insurance
proceeds unless it was "reasonably satisfied that Restoration
will be completed on or before . . . 12 months after the

occurrence of such fire." (Doc. # 7-2 at 21, ¶ 4.3(b)(i)(G)(2)). The Bank argues that the undisputed facts on file show that restoration of the property could not be completed within twelve months of the fire.

However, the file contains sufficient evidence for a reasonable fact-finder to determine that the Bank, through its various agents, unreasonably "withheld or delayed" approval of CFBP's plans to restore the property. CFBP submitted its first set of restoration plans to the Bank's representative on August 19, 2008. As argued by CFBP in its response to the Motion for Summary Judgment, "from August 19 until December 16, 2008, -- four of the twelve months afforded in the [Agreement] -- Lender unfairly frustrated the agreed common purpose of the parties' [Agreement]." (Doc. # 62 at 11). When only twelve months are allocated for restoration, a reasonable fact-finder could determine (regardless of broad discretionary language in favor of the Bank in the Agreement), that the Bank was obligated to promptly accept or reject CFBP's restoration proposals.

The Court determines that the Bank's ultimate decision to reject CFBP's initial restoration plan was reasonable and fell within its discretion under the contract. However, CFBP's claims survive summary judgment due to the protracted manner

23

in which the Bank made its decision.  CFBP's initial proposal for restoration was drafted in an effort to entice Packing Corporation of America to return as a tenant.  It is easy for the Bank, in hindsight, to characterize CFBP's initial restoration plans as unfeasible, especially since, as of the date that such plans were finally rejected, Packing Corporation of America had walked away from the table.

A prompt rejection of the plans, if they were, in fact, unfeasible, would have afforded CFBP the opportunity to submit different plans to the Bank and work toward restoration within the one year time frame the parties chose in their Agreement. However, the Bank failed to either accept or reject the initial restoration plan, and after a lengthy delay, Packing Corporation of America abandoned the idea of leasing at the property.  By the time CFBP submitted its second round of restoration plans on December 22, 2008, it was too late to complete restoration under the one-year window set out in the Agreement. (Alexanian Aff. Doc. # 63 at ¶ 25).

Another condition precedent to disbursement of the second insurance proceeds was that certain leases held by CFBP's tenants remain in effect "notwithstanding the occurrence" of any casualty.  On this matter, the Agreement states:

Leases demising in the aggregate a percentage

24

amount equal to or greater than fifty percent (50%)
. . . of the total net rentable space in the
Property which has been demised under executed and
delivered Leases in effect as of the date of the
occurrence of such fire or other casualty . . .
shall remain in full force and effect during and
after the completion of the Restoration and
Borrower shall have furnished to Lender evidence
satisfactory to Lender that Saddle Creek
Corporation and Stock Building Supply of Florida,
Inc. shall continue to lease and operate their
premises at the Property notwithstanding the
occurrence of any such fire . . . and will make all
necessary repairs and restorations thereto at their
sole cost and expense.

(Doc. # 7-2 at 21). The Bank argues that it is entitled to
summary judgment because the uncontested evidence shows that
Saddle Creek Corporation did not continue to lease space at
the property after the fire. A closer look, however, reveals
that, although Saddle Creek left the property, it did not do
so because of the fire. Saddle Creek remained as a tenant
until it filed for bankruptcy in May 2009, approximately a
year and a half after the fire. (Alexanian Aff. Doc. # 63 at
¶ 33(a)). If the Court were to adopt the Bank's position on
this matter, it would, in effect, be reading certain words out
of the Agreement (those words being "notwithstanding the
occurrence of any such fire"). Three Keys, Ltd. v. Kennedy
Funding, Inc., 23 So. 3d 894, 903-04 (Fla. 5th DCA 2009)("An
interpretation giving a reasonable meaning to all provisions
of a contract is preferred to one that renders part of the

contract meaningless.")

The Bank also contends that CFBP did not met the cash to debt ratio requirement for receiving the second insurance proceeds.  The Bank does not offer sufficient evidence in support of this argument for this Court to find that such condition precedent was not satisfied by CFBP.  The Bank also makes passing reference to other conditions precedent in the Agreement, but has not supported its arguments by pointing to evidence in the Court's file.

Upon due consideration, the Court declines to grant summary judgment on the basis that CFBP failed to meet the conditions precedent to receipt of the insurance proceeds. There is a genuine issue of material fact as to whether CFBP failed to meet the conditions precedent enumerated in the Agreement.  There is also a genuine issue of material fact in dispute concerning whether the Bank unreasonably withheld and/or delayed approval or rejection of CFBP's restoration plans.  Furthermore, whether the Bank's actions or inactions prevented CFBP from being able to satisfy the conditions precedent to receipt of insurance proceeds presents a genuine issue of material fact.

## 2.   **The Matter of the Casualty Consultant**

In addition to asserting that the Bank caused CFBP's

failure to meet conditions precedent in the Agreement, CFBP also asserts that summary judgment is not appropriate because the Bank failed to retain a Casualty Consultant.  Section 4.3(b)(iii) of Agreement discusses the role of the Casualty Consultant:

> All plans and specifications required in connection with the Restoration shall be subject to prior review and approval in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"), which approval shall not be unreasonably withheld or delayed. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which approval shall not be unreasonably withheld or delayed.  All costs and expenses incurred by Lender in connection with making the net proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(Doc. # 7-2 at 22).

In his affidavit, Alexanian states, "had Wheeler retained a consulting engineering firm [a Casualty Consultant], he could have obtained sufficient estimates of cost.  At this point, Wheeler's offloading the engineering expenses associated with preparing budgets for the project presented

. . . appeared to me to be yet another self-imposed roadblock to review of the revised plans." (Alexanian Aff. Doc. # 63 at ¶ 27, n. 3).  Wheeler admitted during his deposition that he had never serviced a casualty of this magnitude and did not seek out assistance from anyone. (Wheeler Dep. Doc. # 64 at 49:17-50:4).  In addition, Wheeler testified that he was not qualified to review engineering plans and drawings. (<u>Id.</u> at 114:14-25, 175:6-9).

The Court determines that the Bank's failure to hire a casualty consultant bolsters CFBP's claim that the Bank breached that portion of the contract requiring that the Bank make restoration proceeds available to CFBP.

Upon due consideration, the Court denies the Bank's motion for summary judgment to the extent that it seeks summary judgment as to CFBP's complaint counts I, III, IV, V, and VI.  As to these counts, which concern the restoration proceeds, the Bank has not demonstrated the absence of genuine issues of material facts nor has it established that it is entitled to judgment as a matter of law.  In addition, as noted above, the Court denies the Motion for Summary Judgment as to Count VII because the Bank failed to brief the Court as to the replacement account.

B. **The Bank's Counterclaim and Third-Party Claim**

In the Counterclaim, the Bank asserts the following counts against CFBP: foreclosure of mortgage (count I); foreclosure of security interest (count II); breach of promissory note (count III); and breach of contract (count IV). In its third-party claim, the Bank sues Alexanian for breach of guaranty (count V). The Bank seeks summary judgment as to counts III, IV, and V. However, unlike its lengthy and detailed assault on CFBP's complaint counts, the Bank's Motion for Summary Judgment is virtually silent on its own claims. Although it is the movant, it has not pointed to evidence on file to support its own claims. Nor has the Bank attempted to rebut the affirmative defenses arrayed against its claims.

It is not disputed that CFBP did not make its monthly mortgage payment on January 11, 2010, or any time thereafter. (Doc. # 29 at ¶ 28). In addition, it appears that Alexanian signed a guaranty covering payment of the entire debt in the instance of default. (Doc. # 26-3). However, CFBP correctly asserts that if the Court denies the Bank's Motion for Summary Judgment, "Lender will not have disposed of the affirmative defense that Lender committed the first material breach of dependent covenants of the MSA." (Doc. # 62 at 18).

"Under Florida law, a breach of a dependent covenant

29

amounts to a breach of the entire contract." <u>SEB, S.A. v. Sunbeam Corp.</u>, 148 F. App'x 774, 788 (11th Cir. 2005)(internal citation and alterations omitted).  The <u>Sunbeam</u> court further explained:

> A covenant is dependent where it goes to the whole consideration of the contract; where it is such an essential part of the bargain that the failure of it must be considered destroying the entire contract or where it is such an indispensable part of what both parties intended that the contract would not have been made with the covenant omitted.

<u>Id.</u> at 788 (internal citation omitted).

This Court agrees with CFBP that there remains a genuine issue of material fact as to whether the Bank committed the first material breach, and therefore, a summary judgment in favor of the Bank on its claims is not warranted.  In this case, the Bank has failed to rebut or even mention CFBP and Alexanian's affirmative defenses.  Accordingly, evaluating all of the evidence in the light most favorable to the non-movants, summary judgment on the Bank's counterclaim counts and third-party claim is not warranted.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant U.S. Bank, National Association's Motion for Summary Judgment as to Counts I, III, IV, V, VI, and VII Asserted by CFBP and as to Counts III, IV, and V of

Defendant's Counterclaim and Third-Party Claim (Doc. # 54) is **DENIED**.

    **DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>6th</u> day of July, 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record